UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20 CR 98 HEA/JMB |
| | ) | |
| JERRY LEECH, D.C., | ) | |
| | ) | |
| Defendant. | ) | |

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

**1.    PARTIES:**

The parties are defendant **Jerry Leech, D.C.** ("the Defendant"), represented by defense counsel **John D. Stobbs**, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri.  The Court is neither a party to nor bound by this agreement.

**2.    GUILTY PLEA:**

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the Defendant's voluntary plea of guilty to Counts 1, 11, 31, and 34 of the pending indictment, the Government agrees to move for the dismissal as to the Defendant of Counts 2 to 10, 12 to 30, 32-33, and 35 to 40 at the time of sentencing. Moreover, the United States agrees that no further federal criminal prosecutions will be brought in this District against the Defendant relative to (a) his or his co-conspirators' possession, use, purchase, sale, or distribution of illegal prescriptions

or controlled substance medications obtained through the use of illegal prescriptions from 2014 to January 2020; (b) the soliciting and receiving of illegal kickbacks in return for referrals to Central Diagnostic Laboratory ("CDL") of items and services to be reimbursed by federal health care programs from 2014 to January 2020; (c) the submission of reimbursement claims to health care benefit programs for the above-described illegal prescriptions and items and services obtained by illegal kickbacks, from 2014 to January 2020, and (d) the submission of false and fraudulent documents to the Bank of Edwardsville in support of the Defendant's application for a mortgage loan, of which the Government is aware at this time

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties agree that the Government will not request an upward departure and the Defendant will not request a downward departure from the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court. The parties further agree that the Defendant may request a downward variance from the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court, pursuant to Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

3. **ELEMENTS**:

As to **Count 1**, the Defendant admits to knowingly violating Title 18, United States Code, Section 371, and admits there is a factual basis for the plea and further fully understands that the elements of the crime of conspiracy are:

*One*, two or more persons reached an agreement or came to an understanding to knowingly and intentionally possess with the intent to distribute a controlled substance;

*Two*, the Defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

*Three*, at the time the Defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

*Four*, while the agreement or understanding was in effect, a person or persons who had joined in the agreement or understanding knowingly did one or more overt acts for the purpose of carrying out or carrying forward the agreement or understanding.

As to **Count 11**, the Defendant admits to knowingly violating Title 21, United States Code, Section 843(a)(3) and admits there is a factual basis for the plea and further fully understands that the elements of the crime of acquiring or obtaining possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge are:

*One*, the Defendant acquired and obtained a controlled substance;

*Two*, the Defendant acted knowingly and intentionally; and

*Three*, the acquisition of the controlled substance was the result of misrepresentation, fraud, forgery, deception, or subterfuge.

As to **Count 31**, the Defendant admits to knowingly violating Title 42, United States Code, Section 1320a-7b(b)(1)(B), and admits there is a factual basis for the plea and further fully understands that the elements of the crime of soliciting and receiving illegal kickbacks for referrals are:

*One*, the Defendant offered or paid remuneration in return for referring an individual for

an item or service;

*Two,* one purpose for which the remuneration was solicited or received was to induce or reward referrals for an item or service;

*Three*, the item or service was to be paid in whole or in part under a federal health care program; and

*Four,* the Defendant knew that his conduct was wrongful.

As to **Count 34**, the Defendant admits to knowingly violating Title 18, United States Code, Section 1347, and admits there is a factual basis for the plea and further fully understands that the elements of the crime of executing a health care fraud scheme are:

*One*, the Defendant knowingly devised or knowingly participated in a scheme or artifice to obtain money or property by means of false or fraudulent pretenses, representations, or promises;

*Two,* the pretenses, representations, or promises were material, that is, they would reasonably influence a person to part with money or property;

*Three*, the Defendant did so with the intent to defraud;

*Four,* the purpose of the scheme and artifice to defraud was to obtain money or property owned by or under the custody or control of a health benefit program; and

*Five,* the Medicare Program and the Missouri Medicaid Program are federal health benefit programs.

4.  **FACTS**:

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

4

**Defendants**

a.       At all relevant times, the Defendant was a doctor of chiropractic medicine, licensed to practice chiropractic medicine in the state of Missouri.  Since in or about April 2014, the Defendant has owned, operated, or managed one or more health care related businesses, including API, IPM, American Pain Clinic, Midwest Medical Marketing, LLC, and the Institute for Regenerative Medicine. The Defendant admits that he has never been licensed as a medical doctor or otherwise authorized to practice as a medical doctor in the United States.

b.       At all relevant times, co-defendant Stanley L. Librach, M.D. ("Dr. Librach") was a medical doctor, licensed to practice medicine in the state of Missouri. Since in or about February 2009, Dr. Librach has owned, operated, or been the medical director for one or more health care related businesses, including American Pain Institute, LLC ("API"); IPM; and Stanley Librach, M.D., D.D.S., LLC ("Librach, LLC").

c.       At all relevant times, co-defendant Dr. Asim Ali ("Dr. Ali") was a medical doctor, licensed in the state of Missouri, and a resident of St. Louis County. Since in or about February 2011, Dr. Ali has owned, operated, or been the medical director for one or more health care related businesses, including the Institute for Pain Management, LLC ("IPM"); AMA Physician Group, LLC; and Central Diagnostic Laboratory.

d.       Since in or about 2013, co-defendant Denis Mikhlin has owned and operated one or more health care related businesses, including: Doctors on the Go, LLC; Doctors on the Go1, LLC (jointly referred to as "DOTG"); and D. Mikhlin Enterprises, LLC. Mikhlin has never been licensed as a medical doctor or otherwise authorized to practice as a medical doctor in the United States.

e.       The Defendant admits that he, Dr. Librach, and Dr. Ali used the above described

5

businesses to carry out the crimes to which the Defendant is pleading guilty. Specifically, they created and caused to be created prescriptions for controlled substance medications outside the scope of professional medical practice and without a legitimate medical purpose. The Defendant admits that he knew Dr. Ali and Dr. Librach had not examined or determined that the patients, whose names appeared on the prescriptions, had a medical need for the controlled substance medications. The Defendant further admits that he knew pharmacies would submit reimbursement claims to Medicare and Medicaid for the medications obtained through the use of these illegal prescriptions.

### Relevant Medicare Provisions

f.      The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. Medicare Part B reimburses health care providers for covered health services that they provide to Medicare beneficiaries in outpatient settings.

g.      CMS acts through fiscal agents called Medicare Administrative Contractors ("MACs") which are statutory agents for CMS for Medicare Part B. Wisconsin Physicians Service Insurance Corporation ("WPS") is the Part B MAC for Eastern Missouri and thus processes reimbursement claims that the Defendant, Dr. Librach, Dr. Ali, CDL, API, IPM, and DOTG submitted to Medicare.

h.      To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique

provider number, which is a necessary identifier for billing purposes.

     i.      Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

     j.      The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program. Remuneration is anything of value, including money, goods, or services. Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

     k.      Between 2012 and 2016, the Defendant and his co-defendants Dr. Librach, Dr. Ali, and Mikhlin completed and signed Medicare enrollment applications, which contained Section 14, entitled "Penalties for Falsifying Information." Section 14 informed the applicant that he or she could be criminally prosecuted (a) for executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment for health care benefits, items, or services.

     l.      The Defendant completed several Medicare provider enrollment applications, including one in or about October 2013 as an individual provider and one in or about March 2014 as the "DC/Managing Owner" of API. Both of these applications contained a section, entitled "Penalties for Falsifying Information," and a "Certification Statement," which the

Defendant signed:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

### Relevant Missouri Medicaid Provisions

m.      MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income Medicaid recipients.

n.      Between December 20, 2013 and May 9, 2016, the Defendant and co-defendants Dr. Librach, Dr. Ali, and Mikhlin signed Missouri Medicaid provider agreements, which contained the following promise:  "I will comply with the Medicaid manual, bulletins, rules, and regulations as required by the Division of Medical Services and the United States Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment."

### Relevant Provisions Concerning Controlled Substance

o.      Certain prescriptions drugs are defined by federal and state law as controlled substances, which are drugs that have some potential for abuse or dependence. Controlled substances are placed into one of five schedules, based on the potential for abuse and the severity of the effects if a person abuses the drug. Of the controlled drugs that can legally be prescribed, Schedule II drugs have the highest potential for abuse because of the risks of severe

psychological or physical dependence. Oxycodone, hydrocodone, methadone, morphine, hydromorphone, oxymorphone, fentanyl, and amphetamines are Schedule II drugs.

      p.    Federal regulation, 21 CFR 1306.04(a), provides that:

> a prescription drug for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing of a controlled substances is upon the prescribing practitioner . . . . An order purporting to be a prescription issued in the usual course of professional practice … is not a prescription within the meaning of section 309 of the Act (21 U.S.C. 829) and the person . . . issuing the [purported prescription] shall be subject to the penalties provided for violations of the provision of law relating to controlled substances.

      q.    The Missouri Board of Registration for the Healing Arts ("Board") licenses and regulates medical doctors and certain other health care practitioners.  The Board prohibits medical doctors from signing a blank prescription form or otherwise prescribing a "drug, controlled substance or other treatment" unless the doctor has established a physician-patient relationship and conducted a sufficient examination of the patients.  See R.S. Mo. 334.100(2)(4).

## Description of the Conspiracy and Scheme

      r.    In or about February 2014, the Defendant and co-defendant Dr. Librach incorporated and opened API, which described itself as a multilevel pain management clinic providing chiropractic, medical, and other health related services. In an August 2014 Medicaid application, the Defendant identified himself as an 82% owner of API and Dr. Librach as an 18% owner of API. Dr. Librach was identified as the medical director and the Defendant was identified as the day-to-day manager of API.

      s.    On or about March 15, 2016, the Defendant received a letter from WPS, notifying him that his and API's Medicare billing privileges were revoked.  The revocation stemmed from a false statement the Defendant made on an earlier Medicare application.

t.       In April 2016, Dr. Ali and the Defendant's wife opened IPM and identified themselves as the owners. The Defendant subsequently, in December 2017, registered IPM in the state of Missouri and listed his mother as the organizer of IPM. The Defendant identified himself as the "Chief of Staff" of IPM and similar to his role at API managed the day-to-day operations of IPM. At times, IPM operated out of several locations, including Woodfield Lane, Old Tesson Ferry Road, and Grandview Plaza in St. Louis County.

u.       The Defendant admits that Dr. Ali served as the medical director of IPM from April 2016 to 2018 and at various times, Dr. Librach served as medical director for IPM. As IPM medical director, Dr. Ali and Dr. Librach were responsible for supervising the IPM nurse practitioners. The Defendant further admits that he knew state and federal laws and regulations prohibited Dr. Ali and Dr. Librach from pre-signing prescriptions for controlled substance medications and required that they establish a physician-patient relationship and conduct a sufficient examination of the patients before prescribing medication.

v.       The Defendant admits he knew that none of the IPM staff, including the advanced nurse practitioners and chiropractors, were authorized under state or federal laws to prescribe controlled substances.

Dr. Ali and Dr. Librach Pre-Signed Prescriptions for Controlled Substances

w.       The Defendant admits that Dr. Ali or Dr. Librach typically would be present at IPM, one day a week for about two hours, to pre-sign prescriptions to be given to patients on their next visit to the clinic. The Defendant admits he knew Dr. Ali and Dr. Librach would sign a stack of prescriptions while at the clinic but did not physically see, examine, or evaluate the patients on the dates they signed the prescriptions or the dates the patients actually received the controlled substance prescriptions. The Defendant further admits that Dr. Ali and Dr. Librach

10

rarely looked at patient's charts before pre-signing the prescriptions and did not determine a legitimate medical need for the controlled substances medications before they pre-signed the prescriptions.

        x.      The Defendant admits that Dr. Ali and Dr. Librach pre-signed controlled substance prescriptions for patients, who repeatedly tested negative for the prescribed controlled substance medications but tested positive for non-prescribed or illegal controlled substances. The Defendant admits that neither he, Dr. Ali, nor Dr. Librach addressed the obvious diversion of the prescribed controlled substances by their patients. The Defendant further admits that he actively encouraged practitioners to prescribe controlled substances to patients who tested negative for the prescribed drugs and tested positive for illegal street drugs.

        y.      The Defendant admits he used and signed the names of doctors on controlled substance prescriptions although the Defendant knew he was not a licensed medical doctor and was not authorized to order prescription medications.

The Defendant Sold Controlled Substance Prescriptions

        z.      The Defendant admits that he solicited and received money or other things of value from individuals in exchange for fraudulent prescriptions. The Defendant knew the individuals did not have a doctor-patient relationship with the doctors he listed or caused to be listed on the fraudulent prescriptions.

        aa.      The Defendant admits that he met with co-defendant T. Spates, accompanied at times by co-defendants Butler, Price, Erica Spates, and others at IPM, about two times a month. The Defendant admits that T. Spates gave him names to be listed on the fraudulent controlled substance prescriptions and would retrieve the fraudulent prescriptions from him.

        bb.      The Defendant admits that he knew that co-defendants T. Spates, E. Spates,

Price, and others had recruited or identified individuals to be listed as patients on the fraudulent prescriptions. In reality, these individuals were relatives, friends and acquaintances of the defendants, were not patients of Dr. Librach, and did not have a doctor-patient relationship with Dr. Librach.

cc.      The Defendant admits that Dr. Librach was listed as the prescribing doctor on many of the fraudulent prescriptions, although the Defendant knew Dr. Librach had not seen nor examined the individuals listed as patients on the fraudulent prescriptions.

dd.      The Defendant admits that T. Spates typically paid him between $200 and $500 for each prescription for controlled substances, including oxycodone and oxycontin prescriptions. The Defendant admits T. Spates paid him about $4,000 to $5,000 each time she received fraudulent prescriptions from him.

ee.      The Defendant admits that defendants T. Spates, Price, E. Spates, and other co-conspirators had the fraudulent prescriptions filled at local pharmacies, including Walgreens and Shop 'n Save pharmacies.

ff.      The Defendant admits that he instructed the clinic staff to tell pharmacies that prescriptions were legitimate, although he knew the prescriptions were fraudulent.

<u>The Defendant  Solicited and Received  Illegal Kickbacks from CDL for Referrals</u>

gg.      On or about February 23, 2016, the Defendant incorporated and opened Midwest Medical Marketing, LLC ("Midwest Marketing") in St. Louis, Missouri. Midwest Marketing was a marketing company, which referred urine specimens to CDL and other labs. The Defendant admits that he, Dr. Ali, Dr. Librach, and other unindicted co-conspirators agreed that CDL would pay Midwest Marketing for each urine specimen that the Defendant referred or caused to be referred to CDL.

hh.     The Defendant admits that on or about April 30, 2017, he received CDL check #3065 payable to Midwest Marketing for $7,840.00. The memo line of the check states: "April mkting fees" with the number 211 over 13, indicating that Midwest Marketing sent CDL 224 specimens for testing and CDL paid $35.00 for each of the 224 specimens it received from Midwest Marketing. The Defendant admits that he knew the CDL payment for referrals was wrong and illegal.

ii.     The Defendant admits that on or about July 17, 2017, CDL wrote check #3183 in the amount of $1200 to S.H., an employee of co-defendant Dr. Librach, and further admits that one purpose of the payment was to induce Dr. Librach to refer specimens to CDL.

jj.     The Defendant admits that he knew CDL would submit reimbursement claims to Medicare and Medicaid for tests performed on specimens and also knew these programs would not pay for services obtained as a result of illegal kickbacks. The Defendant also admits that at the time the payments were made, he knew paying kickbacks for referrals of medical items and services was wrong and illegal.

kk.     The parties stipulate that CDL paid Midwest Marketing at least $150,795 in bribes for specimens referred to CDL. The parties further stipulate that the anticipated benefit to CDL from the referrals was at least $861,600, representing reimbursement from federal health care programs for tests performed on these specimens.

**Amount of Loss to Health Care Benefit Programs**

ll.     The parties stipulate that federal health care benefit programs, including Medicare Medicaid, and Tricare, suffered a loss of $4,718,561 as a result of the conspiracy and fraud scheme to which the Defendant is pleading guilty. The parties further stipulate that $4,718,561 constitutes restitution, which is based on the reimbursement paid to CDL for tests

13

performed by CDL and the reimbursements paid to pharmacies for fraudulent controlled substance prescriptions.

## Amount of Controlled Substances

mm.    The parties stipulate that between in or about 2014 to in or about 2019, the Defendant and his co-defendants possessed or caused to be possessed, with the intent to distribute, the Schedule II, III, and IV controlled substances as outlined in the chart below:

| Controlled Substance | Pills/Units | Equivalent KG of Marijuana |
|---|---:|---:|
| Oxycodone | 109,807 | 11,782 |
| Hydrocodone | 7,227 | 469 |
| Methadone | 2,771 | 9.1 |
| Morphine | 1,830 | 13.73 |
| Hydromorphone | 1,470 | 25.5 |
| Oxymorphone | 1,110 | 111 |
| Fentanyl | 655 | 0.06 |
| Amphetamines | 240 | 144 |
| Schedule III Drugs | 5,360 | 5.36 |
| Schedule IV Drugs | 10,153 | 0.64 |
| **TOTAL** | **130,470** | **12,561** |

nn.    The amount of Schedule II, III and IV controlled substances attributable to the Defendant is not subject to precise calculation. However, based upon the available evidence, including medical records, Medicare and Medicaid claims data, and other records, the parties have agreed the Defendant is accountable for 97,867 oxycodone pills prescribed for API and IPM patients and distributed to others outside the scope of professional medical practice and for no legitimate medical purpose. The 97,867 oxycodone pills are the equivalent to 9747.25 kilograms of marijuana.

## 5.    STATUTORY PENALTIES:

The Defendant fully understands that the maximum possible penalty provided by law for the crime of conspiracy, as charged in **Count 1**, to which the Defendant is pleading guilty is

14

imprisonment of not more than 5 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

The Defendant fully understands that the maximum possible penalty provided by law for the crime of possessing with the intent to distribute or dispense controlled substances, as charged in **Count 11**, to which the Defendant is pleading guilty is imprisonment of not more than 4 years, a fine of not more than $250,000, or both such imprisonment and fine.  The Court may also impose a period of supervised release of not more than 3 years.

The Defendant fully understands that the maximum possible penalty provided by law for the crime of soliciting and receiving illegal remuneration for referrals of items and services paid by federal health care programs, as charged in **Count 31**, to which the Defendant is pleading guilty is imprisonment of not more than 10 years, a fine of not more than $100,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

The Defendant fully understands that the maximum possible penalty provided by law for the crime of executing a health care fraud scheme, as charged in **Count 34**, to which the Defendant is pleading guilty is imprisonment of not more than 10 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

6.    **U.S. SENTENCING GUIDELINES:  2018 MANUAL:**

The Defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S.

15

Sentencing Guidelines Total Offense Level provisions.

    a.   **Chapter 2 Offense Conduct:**

        **(1)**   **Base Offense Level:**  The parties agree that the base offense level for **Count 1** is 32 as found in Section 2D1.1 and 2X1.1; the base offense level for **Count 11** is 8 as found in Section 2D1.1; the base offense level for **Count 31** is 8 as found in Section 2B4.1; and the base offense level for **Count 34** is 6 as found in Section 2B1.1.

        **(2)**   **Specific Offense Characteristics:**  The parties agree that the following Specific Offense Characteristics apply:  The base offense level for **Count 31** should be increased by 14 levels, pursuant to Section 2B4.1(b) and Section 2B1.1(b)(1)(H), because the anticipated amount of the benefit conferred by the bribes exceeded $550,000, but did not exceed $1,500,000.

    The base offense level for **Count 34** should be increased by 18 levels, pursuant to Section 2B1.1(b)(1)(J), because the amount of the loss exceeded $3,500,000, but did not exceed $9,500,000. The offense level for Count 34 should be increased an additional 2 levels, pursuant to 2B1.1(b)(7) because the loss to Government health care programs exceeded $1,000,000.

    b.   **Chapter 3 Adjustments:**

        **(1)**   **Acceptance of Responsibility:** The parties agree that three levels should be deducted pursuant to Section 3E1.1(a) and (b), because the Defendant has clearly demonstrated acceptance of responsibility and timely notified the government of the Defendant's intention to plead guilty. The parties agree that the Defendant's eligibility for this deduction is based upon information presently known. If, subsequent to the taking of the guilty plea, the Government receives new evidence of statements or conduct by the Defendant which it believes are inconsistent with Defendant's eligibility for this deduction, the Government may present said evidence to the Court, and argue that the Defendant should not receive all or part of the

16

deduction pursuant to Section 3E1.1, without violating the plea agreement.

        **(2)**   **Other Adjustments**:  The parties agree that the following additional adjustments apply: The offense level for **Count 34** should be increased four levels, pursuant to Section 3B1.1(a), because the Defendant was an organizer and leader of the criminal activity and increased an additional two levels, pursuant to Section 3B1.3, because he abused a position of public or private trust.

      c.   **Other Adjustment(s)/Disputed Adjustments**:  None

      d.   **Estimated Total Offense Level**:  The parties estimate that the offense level for **Count 1** is 32; the offense level for **Count 11** is 8; the offense level for **Count 31** is 22; and the offense level for **Count 34** is 32. Pursuant to Section 3D1.4, two additional units are added because there are multiple counts. The parties estimate that the Total Offense Level is 31, if the Defendant receives a 3 point reduction for acceptance of responsibility.

      e.   **Criminal History**:  The determination of the Defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the findings of the Presentence Report as to the Defendant's criminal history and the applicable category. The Defendant's criminal history is known to the Defendant and is substantially available in the Pretrial Services Report.

      f.   **Effect of Parties' U.S. Sentencing Guidelines Analysis**:  The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

7.   **WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:**

a.   **Appeal:**  The Defendant has been fully apprised by defense counsel of the Defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

(1)   **Non-Sentencing Issues:**  The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery, the guilty plea, the constitutionality of the statute(s) to which Defendant is pleading guilty and whether the Defendant's conduct falls within the scope of the statute(s).

(2)   **Sentencing Issues:**   In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining a Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this agreement, the Defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea and the agreed Total Offense Level and sentences the Defendant within or above that range.

b.   **Habeas Corpus:**  The Defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

c.   **Right to Records:**  The Defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom

18

of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8.  OTHER:**

     a.  **Disclosures Required by the United States Probation Office:**  The Defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

     b.  **Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:**  Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the Defendant.

     c.  **Supervised Release:**  Pursuant to any supervised release term, the Court will impose standard conditions upon the Defendant and may impose special conditions related to the crime Defendant committed. These conditions will be restrictions on the Defendant to which the Defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the Defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The Defendant understands that parole has been abolished

     d.  **Mandatory Special Assessment:**  Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $400 which the Defendant agrees to pay at the time of sentencing. Money paid by the Defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

     e.  **Possibility of Detention:**  The Defendant may be subject to immediate detention

pursuant to the provisions of Title 18, United States Code, Section 3143.

       f.   **Fines, Restitution and Costs of Incarceration and Supervision:**  The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The Defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss.  The Defendant agrees to provide full restitution to all victims of all charges in the indictment.

**ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS**:

       In pleading guilty, the Defendant acknowledges, fully understands and hereby waives her rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the Defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The Defendant further understands that by this guilty plea, the Defendant expressly waives all the rights set forth in this paragraph.

      The Defendant fully understands that the Defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of

the proceeding. The Defendant's counsel has explained these rights and the consequences of the waiver of these rights. The Defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The Defendant is fully satisfied with the representation received from defense counsel. The Defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the Defendant has requested relative to the Government's case and any defenses.

The guilty plea could impact Defendant's immigration status or result in deportation. In particular, if any crime to which Defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the Defendant of the possible immigration consequences, including deportation, resulting from the plea.

9.    **VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT**:

This document constitutes the entire agreement between the Defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the Government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the Defendant states that no person has, directly or indirectly, threatened or coerced the Defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The Defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The Defendant further acknowledges that this guilty plea is made of the

Defendant's own free will and that the Defendant is, in fact, guilty.

**10.  CONSEQUENCES OF POST-PLEA MISCONDUCT:**

After pleading guilty and before sentencing, if the Defendant commits any crime, other

than minor traffic offenses, violates any condition of release that results in revocation, violates

any term of this guilty plea agreement, intentionally provides misleading, incomplete or

untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United

States, at its option, may be released from its obligations under this agreement. The Government

may also, in its discretion, proceed with this agreement and may advocate for any sentencing

position supported by the facts, including but not limited to obstruction of justice and denial of

acceptance of responsibility.

**11.  NO RIGHT TO WITHDRAW GUILTY PLEA:**

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the Defendant

understands that there will be no right to withdraw the plea entered under this agreement, except

where the Court rejects those portions of the plea agreement which deal with charges the

Government agrees to dismiss or not to bring.

January 14, 2021
Date

Dorothy L. McMurtry
DOROTHY L. McMURTRY
Assistant United States Attorney

1/19/2021
Date

JERRY LEECH, D.C.
Defendant

1-19-21
Date

JOHN D. STOBBS
Attorney for Defendant

22