# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-CR-98-HEA/JMB |
| | ) | |
| JERRY LEECH, D.C, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

### *I. Introduction*

The first time the undersigned met this Honorable Court was in the Fall of 1999. The undersigned was waiting for an Assistant Circuit Attorney to try to convince him not to charge an Illinois client in Missouri. The undersigned sat through a morning of sentencings. The Court pounded Defendants who needed to be pounded and showed a kindness and understanding for those who needed kindness and understanding. The undersigned specifically recalls a colloquy the Court had with a young drug addicted prostitute who was sentenced to probation.

Based on this, the Court is one of the few Courts the undersigned enters for sentencing with no concerns about the thoughtfulness that goes into determining a proper sentence for a Defendant.

The issue here is what good does an extended period of incarceration do for someone like Jerry Leech? Why is it necessary to incarcerate Jerry Leech to an extended period of incarceration based on things that happened over 5 years ago? Should a sentencing judge look at the 3553 factors in the present or at the time the crime occurred? In all candor, the undersigned strongly believes that when all of the sentencing factors are considered, a significant variance is warranted.

1

## II.  Drs. Stanley Librach and Asim Ali

Acceptance of responsibility is the coin of the realm in the federal criminal justice system.

Within weeks of retaining the undersigned, Jerry began negotiating with the Government to enter a plea of guilty. Unlike Drs. Librach and Ali, once Jerry pleaded "guilty," he never attempted to cast blame on anyone other than himself for his transgressions.

If one looks closely enough at the courtroom doors when Librach and Ali entered to plead guilty, one could still see their fingernail marks from holding on so as to not enter the courtroom and take responsibility for their crimes.

These two individuals are poster children for stringing a case out for as long as possible before pleading "guilty."  Only when they had run out the string and the Court made it clear no more continuances would be allowed did these two decide to plead guilty.

At sentencing, where Librach was sentenced to 5 years in jail and Ali to almost 7 years in jail, instead of 100% accepting responsibility for their actions, these two medical doctors heaped the blame on the chiropractor.  Jerry doesn't blame Librach or Ali for his crimes.  He blames himself and is willing to accept responsibility for his actions.  This alone shows why Jerry deserves a much smaller sentence than either of his co-conspirator doctors.

## III. 3553 Factors

The foregoing is important because for purposes of 3553 the Court has to "square" the "good Jerry" with the "bad Jerry."  From any Defendant's standpoint, the most important aspect of sentencing is "who" they are.  From the Government's standpoint, generally, the most important aspect of sentencing is the crime.

Due to the number of sentencings that have occurred in this case, it would be burdensome to the court to be forced to read a defense attorney's "theory" of why Jerry's crime really isn't so bad or to try to blame someone else for his actions.

In "determining the particular sentence to be imposed," after considering the need for just punishment, the Court must consider the nature and circumstances of the offense

and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense 18 U.S.C. § 3553(a)(1)-(7).

Oftentimes when looking at 3553(a)(1) the focus is on "the nature and circumstances of the offense" and the next phrase, "and the characteristics of the Defendant" is ignored.

*a. History And Characteristics Of Jerry Leech*

In one way or the other, a root of all crimes is greed. But, for 3553 purposes not all greed is the same.

The Presentence Investigation Report does a wonderful job encapsulating Jerry's life. The PSR describes Jerry's hardscrabble childhood, his frayed relationship with his Dad, his struggles to earn a college diploma and ultimately his marriage, widowhood and fatherhood.

In order to understand Jerry's "greed," one has to go back to his childhood, where paragraph 106 shows the difficulties the Leech family endured in rural Missouri, Arkansas and Mississippi. Poverty is a hard thing for someone like the undersigned, who grew up in an upper middle-class household, to understand. Jerry had to do without a lot of material things most people take for granted. It is hard to read Paragraph 106 and not feel empathy for Jerry.

While poverty isn't an excuse for greed, it certainly is an explanation as to how someone could begin going down the wrong path.

When Jerry was 14, he witnessed one of his best friends killed in a hunting accident. Common sense dictates this event had an adverse impact on Jerry. At the very least he would have suffered from post-traumatic stress disorder. Anyone reading this Sentencing Memorandum would send their 14 year old kid to counseling for this tragedy. Real healthcare doesn't exist in poor communities. Sending a poor 14 year old kid to a psychologist to deal with mental traumas like post-traumatic stress disorder is unrealistic. Like most bumps Jerry encountered as a kid, he simply had to deal with watching his friend be killed.

Jerry was one of the smartest kids in his tiny high school class. His native intelligence combined with drive resulted in an academic scholarship to study nuclear engineering at Mississippi State. Because Jerry's scholarship was only for tuition and not housing or other expenses, he had to drop out of Mississippi State for financial reasons.

After earning his diploma at Arkansas State University, Jerry matriculated to Logan College of Chiropractic.

Jerry built a successful chiropractic practice, but as is evidenced by this case, took a twisted path to success.

His personal life likewise was not linear. In 2009 Jerry married who he thought was the love of his life, April Campbell. Sadly, April was severely addicted to numerous drugs and in 2015 the marriage ended in divorce. April died of a drug overdose in 2016.

The one constant in Jerry's life is him Mom Patsy Ann. She tells the Court (Exhibit A) what a wonderful son Jerry is and how he has been her emotional and economic support since the passing of his father in 1999. Her letter demonstrates the support he has from his loved ones.

Often lost in these type of fraud cases is that some of the doctors actually have talent. Just because their greed got the best of them doesn't necessarily mean they're bad in their chosen profession. Jerry is an extremely, extremely talented chiropractor.

Jerry's patients ultimately become his friends. Ben Dodd (Exhibit B)

"survived a tragic boat explosion at the Lake of the Ozarks that claimed a friend's life and left me with severe injuries, including broken ankles, severed tendons, nerve damage, and a broken neck. The resulting chronic pain, numbness, and loss of mobility were debilitating. Despite extensive medical treatment, it was Jerry who provided me with relief when others could not. His care alleviated my pain, restored sensation in my arm, and allowed me to sleep peacefully for the first time in years. His ongoing support and follow-up care, which go far beyond what is typical in today's medical field, have been nothing short of life-changing."

Nathan Causey is a longtime friend of Jerry's. While Jerry was attending Logan Chiropractic College he asked Mr. Causey to come so that the class could poke and prod him. Jerry detected an odd lump and sent Mr. Causey to an ENT, where it was determined

that "after some more tests that [he] had thyroid cancer and needed a thyroidectomy. (Exhibit C). Thanks to this Divine Intervention, Mr. Causey is alive and well today.

Jo Lynn David, is a retired nurse enjoying her retirement thanks in large part to the wonderful care she received from Jerry. (Exhibit D)

Dr. Kendall Brune (Exhibit E) suffered cluster migraine headaches as a result of a traumatic brain injury.  When he went to Jerry, Dr. Brune was doped up on a bunch of drugs to treat the pain he suffered.  Jerry used his expertise to suggest:

> "a non-traditional plan of care that would eventually reduce my medication dependency by twelve drugs! The best news, within four weeks of chiropractic, exercise and natural-pathic intervention's my cluster headaches ended!"

It is not a stretch to claim that because of his expertise, Jerry was able to give Dr. Brune's life back.

From the standpoint of a chiropractor, Jerry goes above and beyond what most chiropractors would do as expressed by Paul Birner (Exhibit F) who discusses his scoliosis and the treatment, care and kindness he received from Jerry.

### i. Lacy Leech

Stephen King once said "A boy does not need a father unless he is a good father, but a good father is indispensable."  Unfortunately, Jerry didn't have the best Dad growing up, but through his daughter Lacy, Jerry has shown to be a fantastic Dad.

The "real" Jerry Leech is exemplified in his 16 year old daughter Lacy.  Few fathers are as devoted to their children as Jerry is to Lacy.

After his divorce from April, Jerry was awarded sole custody of Lacy.  He rebounded poorly from April, marrying Anne Kurtz shortly after his divorce was finalized. Anne proved to be a mother figure for April, but the reality was that the fissures in the relationship between Jerry and Anne were too great to overcome and the marriage ended in divorce.

Unlike a lot of Dads, Jerry is "present' in Lacy's life.  Jerry did not ignore the turbulence caused to Lacy from both of his failed marriages.  Lacy has been seeing a counselor for some time in order to reduce the stress, pressure and anxiety she must feel.

The letters of support from those who witness Jerry with Lacy are gut-wrenching and show what a truly wonderful Dad Jerry is.

Larry Clendendin (Exhibit G) tells the Court that Lacy is Jerry's priority. Jose Ponce (Exhibit H) who grew up with a father who was incarcerated discusses how any period of Jerry's incarceration would adversely impact Lacy. Tiffany Albrecht's letter (Exhibit I) is powerful. She discusses the impact Jerry has had on Lacy:

> "On a personal level, Dr. Leech is an equally remarkable man. He is a devoted father raising his daughter on his own after the tragic loss of her mother. He is her anchor, her role model, and her only parent. To remove him from her life at this crucial time would cause her irreparable harm and lasting trauma. Beyond his role as a father, Jerry is a friend who can always be counted on—loyal, dependable, and willing to sacrifice his own time and energy to help others in need.
>
> I fully understand that actions carry consequences, and I respect the process before this Court. However, I ask that you also weigh the extraordinary good Jerry has done and continues to do for his family, his patients, and his community. He is not defined by a single mistake, but by a lifetime of service, compassion, and integrity. The impact of his absence would be felt far beyond himself—it would affect his patients, his community, and most deeply, his daughter.
>
> Your Honor, I respectfully and strongly urge you to consider the man Dr. Jerry Leech truly is: a healer, a father, and a person whose presence makes the lives of those around him better every single day."

Jerry's good friend Jake Parick (Exhibit J) tells the Court:

> "Jerry is also an extraordinary father. As a single parent, he balances the demands of his professional life with an unwavering dedication to his daughter Lacey. He provides her with love, stability, and guidance, ensuring she has every opportunity to grow into a strong, kind, and responsible young lady."

It's almost a Shakespearean tragedy what is occurring regarding Lacy. Unwittingly, by involving himself in these crimes, Jerry has put himself in a position where he could conceivably be removed from Lacy's life for a period of time.

### b. Nature And Circumstances Of The Offense

The plain truth is that no one likes a thief. Most low-level drug conspiracies are more sophisticated than the majority of health care fraud cases that appear before this Honorable Court. Like here, most health care practitioners think they are smarter than what they actually are and think they can game the system out of millions of dollars.

This case is no different. But, for purposes of 18 U.S.C. §3553 the crime is only one piece of the pie this Honorable Court must consider when determining what sentence to impose.

### c. The Need for just punishment

The Merriam-Webster Dictionary defines punishment as:

"1. the act of punishing;
   **2. a: suffering, pain, or loss that serves as retribution;**
      b: a penalty inflicted on an offender through judicial procedure
   3. severe, rough, or disastrous treatment." (Emphasis Added)

For far too long in the federal criminal justice system, the only type of "punishment" viewed as satisfactory was incarceration. Advisory Guidelines pegged an offense and criminal history to a chart and it was only a question of how many months of incarceration in the Bureau of Prisons a sentencing judge would impose.

Thankfully, this antiquated mindset has changed. Hopefully, this Honorable Court will see that Jerry has already suffered pain and loss which serves as adequate retribution for his actions. Hopefully, this Honorable Court will not unnecessarily punish Jerry when it imposes its sentence.

Jerry has been punished for his crime. In all criminal cases, there is a sort of "reputational punishment" that occurs. Jerry is a convicted felon. That means something in the circles Jerry runs in.

As a convicted felon, for the rest of his life, Jerry will never be able to handle a firearm or vote.

The mental stress, pressure and anxiety of this case punishes Jerry daily. Knowing that there is a possibility he will be taken from Lacy punishes Jerry more than anyone reading this Sentencing Memorandum can imagine.

*d. Retribution*

Hand in glove with just punishment is retribution. The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity.[1]" The justification for a retributivist theory of punishment is that the punishment will be proportional, and if that punishment is proportional, then it will be fair.[2] Under the current sentencing scheme, proportionality is judged in terms of quantity: how many months of imprisonment represents a fair and proportional sentence. In order to arrive at a just sentence however, the conditions of confinement must factor into the analysis to determine what is a "sufficient but not greater than necessary" sentence.

Even though 53 seems "young" for purposes of retribution, Jerry's age can be a mitigating factor for purposes of sentencing. The cost of incarcerating prisoners over the age of 50 has been estimated to be two to four time the cost of the general inmate population.[3] The myriad life and health problems of inmates before and during incarceration "accelerate their aging process to an average of 11.5 years older that their chronological ages after age 50."[4]

Inmates over the age of 50 suffer increased rates of chronic and terminal illness. The rapid aging of elderly inmates often translates into increased costs for medications, special

---

[1] Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality Relative to What?", 89 MINN. L. REV. 571, 590 (February 2005).

[2] Amit Bindal, Rethinking Theoretical Foundations of Retributive Theory of Punishment, 51 J. INDIAN L. INST. 307, 311 (2009).

[3] U.S. Dep't of Justice, National Institute of Corrections, Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, at 11 (2004)

[4] Id at 8-10

diet, and individualized supervision.[5] The BOP admits that they are ill-equipped to handle the health care and other costs associated with elderly inmates.[6] Based on the infrastructure limitations of BOP facilities alone, the BOP is not equipped to care for elderly inmates: "aging inmates often require lower bunks or handicapped-accessible cells, but overcrowding throughout the BOP systems limits these types of living spaces. Aging inmates with limited mobility also encounter difficulties navigating institutions without elevators and with narrow sidewalks or uneven terrain. The BOP has not conducted a nationwide review of the accessibility of its institutions since 1996."[7] Further, "all inmates are expected to perform activities of daily living, including dressing, cleaning their cells, and moving around the institution. However, staff told [the Office of Inspector General] that aging inmate often cannot perform these activities on their own because of their medical conditions and staff is not responsible for ensuring inmates can accomplish these activities."[8]  Due to the failings of the BOP to properly care for the ever-growing population of aging inmates, the Obama administration expanded the criteria for compassionate release, adding age to the list of reasons an inmate could request compassionate release. [9]

Although he has attempted to maintain his health through his life, Jerry is an "old" 53.  Jerry suffers from a myriad of illnesses that require monitoring and could impact his health still further. Paragraph 111 sets out that Jerry was diagnosed with high blood pressure, type 2 diabetes, and chronic back muscle spasms in 2019.  He was also diagnosed with arthropathy of spinal facet disorder, hypogonadism, and chronic tension-type

---

[5] Office Of The Inspector Gen., U.S. Dep't Of Justice, The Impact Of An Aging Inmate Population On The Federal Bureau Of Prisons 2 (May 2015), https://oig.justice.gov/reports/2015/e1505.pdf [https://perma.cc/8QDL-XHPA] [hereinafter Impact Of An Aging Inmate Population]

[6] Id at 1-2
[7] Id at 24
[8] Id at 19
[9] Eric Holder, U.S. Attorney Gen., Remarks at the Annual Meeting of the American Bar Association's House of Delegates, in 26 FED. SENT'G REP. 75, 75–78, Dec. 2013 (concluding that prison population growth is unsustainable and suggesting an expansion of compassionate release programs as one of many needed improvements)

headache disorder in 2020.    Jerry is currently prescribed Hydrocodone; Alprazolam; Cyclobenzaprine; Lisinopril; and Gabapentin nerve pain medication.

Whereas punishment is the cerebral aspect of sentencing, retribution is the gut aspect of sentencing.  Retribution is really about "getting even."  The hope is that the Court will realize that a 53 year old Defendant who is not in the best of health does not require retribution.

### e. Recidivism

Part and parcel with Jerry's age is recidivism.  A concern the Court has to have is that when Jerry is released from the Bureau of Prisons he will commit other crimes. In Jerry's case, recidivism deals with almost all aspects of 3553.  For instance, someone who recidivates could mean that the public needs to be protected from further crimes of the recidivist.  Or additional punishment for a recidivist promotes respect for the law and deterrence.

Recidivism for a 20 year old is completely different than recidivism for a 53 year old loving father.

Similarly, someone who has as strong of a support group as Jerry is unlikely to commit other crimes.  John Parker (Exhibit K), David Naeger (Exhibit L) and Alex David (Exhibit M) are true friends Jerry has relied on for support throughout the pendency of this case.  They will sustain him while he is on supervised release and help ensure that Jerry does what he is supposed to do.

The Bureau of Prisons and United States Sentencing Commission keeps all sorts of records and statistics regarding what prisoners do after they leave prison.  One such report deals with former inmates and recidivism.  The statistics bare out what common sense dictates; namely that the older one is, the less likely they are to recidivate.  There are numerous interesting findings and conclusions contained in the report and one of the highlights of that report is the finding that:

> "[O]lder offenders were substantially less likely than younger offenders to
> recidivate following release. Over an eight-year follow-up period, 13.4
> percent of offenders age 65 or older at the time of release were rearrested
> compared to 67.6 percent of offenders younger than age 21 at the time of

release. The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased."

The Effects of Aging on Recidivism Among Federal Offenders (EARAFO) report used the FBI's Unified Crime Report (UCR) as well as data of previous arrests of federal offenders from the FBI's Interstate Identification Index (III) system, which is a national index of criminal histories. Again, common sense is borne out by what the EARAFO report found. At page 11 of the Executive Summary, the Commission concluded:

"[I]n general, the Commission found that total adult arrests for federal offenders were highest in the 20-24 age group, and declined sharply thereafter. The national FBI adult arrests in 2016 display the same pattern. For both federal offenders' prior arrest history and national 2016 arrests as reported by the FBI, older age groups had fewer arrests. While there are vast differences among individuals which are not explained by age, age is generally a strong factor influencing the likelihood of committing crime, although the reasons for this are complex."

The below graph and chart from the Executive Summary show the close tie between older age and declining arrests. The hope is that in Jerry's case the Court will see that once out of prison and off of supervised release, the possibility of him committing other crimes greatly recedes.



Fig. 1 Total Arrests by Age
All 2016 U.S. Arrests Compared to Recidivism Study Offenders' Arrest Records

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECIDOS_OFFUPDT and U.S. Department of Justice, Federal Bureau of Investigation Uniform Crime Report, Crime in the United States (2016). The Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

**Recidivism Rates for Federal and State Prisoners by Age at Release: Five Year Post-Release**

| | N | Rearrest % | Reconviction % | Reincarceration % |
|---|---|---|---|---|
| **24 Years or Younger** | | | | |
| *Federal or State Prisoners* | | | | |
| Federal Prisoners | 1,916 | 63.2% | 42.9% | 35.1% |
| State Prisoners | N/A | 84.1% | N/A | N/A |
| **25 to 29 Years** | | % | % | % |
| *Federal or State Prisoners* | | | | |
| Federal Prisoners | 3,489 | 57.6% | 34.9% | 28.2% |
| State Prisoners | N/A | 80.3% | N/A | N/A |
| **30 to 34 Years** | | % | % | % |
| *Federal or State Prisoners* | | | | |
| Federal Prisoners | 3,966 | 50.3% | 28.5% | 22.2% |
| State Prisoners | N/A | 77.0% | N/A | N/A |
| **35 to 39 Years** | | % | % | % |
| *Federal or State Prisoners* | | | | |
| Federal Prisoners | 3,249 | 44.5% | 24.4% | 19.7% |
| State Prisoners | N/A | 78.1% | N/A | N/A |
| **40 Years or Older** | | % | % | % |
| *Federal or State Prisoners* | | | | |
| Federal Prisoners | 7,925 | 32.5% | 17.3% | 13.6% |
| State Prisoners | N/A | 69.2% | N/A | N/A |

While states have improved the completeness of criminal history records, a recent federal study found significant gaps in reporting of dispositions following an arrest. Such gaps occur in the criminal records used in this report, and lead to an undercounting of reconvictions, since missing dispositions are treated herein as the absence of reconviction and reincarceration. *See* U.S. Government Accountability Office, Criminal History Records: Additional Actions Could Enhance the Completeness of Records Used for Employment-Related Background Checks (February 2015), http://www.gao.gov/products/GAO-15-162.

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05_OFFUPDT and Bureau of Justice Statistics, *Recidivism of Prisoners Released in 30 States* (2005).

### f. The need to provide adequate deterrence, and protect the public

Sentencing courts almost always sentence white collar Defendants in an effort to *generally* deter other prospective white-collar Defendants from committing the same crime the Defendant committed.

For crimes based on greed, general deterrence is a mirage. "General deterrence" sounds good when it comes out of the mouth, but the reality is very little will slow a greedy white-collar Defendant down.

Here, specific deterrence should be the focus of deterrence. Jerry is a relatively young man, who is still a licensed chiropractor

For all intense purposes, Jerry's fraudulent conduct and conviction will follow him for the rest of his life. His reputation is in tatters.

Any sentence imposed by this Honorable Court will require a lot of self-reflection on Jerry's part. He made tragically stupid & criminal mistakes which for the rest of his life Jerry will have to fight to ensure that this is not what defines him.

So, just being sentenced for his conduct, Jerry will be specifically deterred from committing further crimes.

Obviously, this deterrence means that the public will be protected from further crimes of Jerry.

### III.  $4,700,000.00

No matter how one looks at it, $4,700,000.00 is a big number.  That's the amount of fraud in the conspiracy.  It's nice to say that the restitution is joint and several, because it makes the amount seem less onerous.

Like most of the co-defendants in this case, Ali is broke and won't make much of a dent in the restitution amount.

The collection arm of the U.S. Attorney's Office is one of the most aggressive in the country.  It has already sought to go after Librach's retirement account and life insurance policy.

Yet, apparently, a little less than $200,000 has been collected from all of the individuals in this case to be used towards restitution.

It would be surprising if Librach and Ali are able to practice medicine in the near future and if so, how much they will earn that could be used towards restitution.

As stated above, Jerry, after a hearing before the Chiropractic Board, was able to maintain his chiropractor's license.  He will be the only co-Defendant able to make a dent in the restitution figure for the simple reason that all of the other co-Defendants will be unemployable when released from prison.  Jerry will be the only co-Defendant with a job which could put a dent in the restitution.  The restitution figure will stay with Jerry until it is paid off which very well could be the rest of his professional career.

### IV. Service Of Sentece At A Halfway House

Jerry requests that this Court recommend he serve his sentence at a federal residential reentry center. Pursuant to 18 U.S.C. § 3621(b), the BOP may place any prisoner in any "place of imprisonment," and a residential reentry center is a "place of imprisonment." Further, there is no cap on the amount of time that someone may spend in a half-way house/residential reentry center.

Suitability and length of placement in the residential reentry center is determined in part based on "any statement by the court that imposed the sentence concerning the purpose for which the sentence to imprisonment was determined to be warranted or recommending any type of penal or correctional facility as appropriate" 18 U.S.C. §3621(b)(4)(B).

Further, Jerry has already demonstrated that he is a good candidate for this alternative form of incarceration. A recommendation that Jerry serve his sentence at a residential reentry facility best accomplishes the goals of sentencing given Jerry's medical ailments, but more importantly his ability to remain a part of Lacy's life, which are needs the BOP cannot adequately address. Lacy will be able to see her father on a frequent basis and the impact of any incarceration will be minimized.

### V. Conclusion

A substantial variance is warranted in this case. In the event the Court desires to sentence Jerry to a term of incarceration, he requests that any sentence be served in a residential reentry facility.

JERRY LEECH

STOBBS LAW OFFICES

BY:

/s/John D. Stobbs II
John D. Stobbs II, No. 43052
E.D.Mo. Number 40623
Attorney for Defendant
307 Henry St. Suite 211
Alton, Illinois 62002
Telephone: (618)462-8484
FAX: (618)462-8585
Email: jds2@stobbslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 25, 2025, a copy of the attached *Defendant's Sentencing Memorandum* was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Ms. Amy Sestric
Assistant U.S. Attorney
111 S. 10th Street
St. Louis, Missouri 63102

STOBBS LAW OFFICES


/s/ John D. Stobbs II
Attorney for Defendant
307 Henry St. Suite 211
Alton, Illinois 62002

15